**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 05-22721-CIV-MOORE/GARBER

INSTITUTO DE PREVISION MILITAR,

      Plaintiff,

vs.

MERRILL LYNCH & CO., INC.,
EDUARDO A. COLOMA, MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED, and ALL PARENTS,
SUBSIDIARIES, AND AFFILIATES OF
MERRILL LYNCH & CO., INC., AND
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED,

      Defendants.

_____/

**CLOSED**
**CIVIL**
**CASE**

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

THIS CAUSE came before the Court upon Merrill Lynch's Motion to Dismiss (dkt # 64) and Eduardo Coloma's Motion to Dismiss Counts I, II, IV, V, and VI (dkt # 65).

UPON CONSIDERATION of the Motions, the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I.**    **BACKGROUND**

Plaintiff Instituto de Prevision Militar ("Plaintiff" or "IPM") is a quasi-governmental agency of the Republic of Guatemala that, *inter alia*, manages the pension funds for members of the Guatemalan Armed Forces. 2nd Amend. Compl. ¶ 2. Beginning in July 2001, non-party Pension Fund of America ("PFA") solicited IPM to open a "retirement trust account" using IPM's pension fund monies. Id. ¶ 18. The retirement trust accounts offered by PFA purported to

have investment and insurance components.  PFA was not registered as a broker-dealer or

investment adviser.  Id. ¶ 20.  PFA presented itself to IPM as a business partner of Merrill Lynch.

Id. ¶ 20.  IPM invested $7,726,799.92 with PFA with the understanding that PFA would invest

the money in secure accounts with Merrill Lynch.  Id. ¶¶ 21–25.  PFA used IPM's money to open

an account with Merrill Lynch in PFA's name.  PFA engaged in an embezzlement and money

laundering scheme and mishandled and misappropriated much of Plaintiff's money.  Id. ¶¶

16–41.  IPM alleges that Merrill Lynch "knowingly provided substantial assistance to [PFA]'s

fraudulent scheme and/or recklessly disregarded numerous red flags, and its actions and

omissions were a proximate cause of the damages incurred by IPM."  Id. ¶ 41.

On November 26, 2002, IPM filed a lawsuit in Miami-Dade Circuit Court against PFA,

alleging twelve claims for relief.[1]  Id. ¶ 42.  The Miami-Dade Circuit Court issued an ex parte

temporary injunction against PFA, but it did not take effect because IPM could not post the

requisite $5,000,000.00 bond.  Id. ¶ 43  As a result of this State court action, IPM subpoenaed

several financial institutions holding PFA funds, including Merrill Lynch.  Based on the lawsuit,

past dealings, and other information, IPM decided to liquidate its account.  Id. ¶ 44.  On February

10, 2003, the Circuit Court granted a motion by IPM to compel Merrill Lynch to liquidate all of

IPM's funds and transfer them to a trust account at Shutts & Bowen, LLP.  Id. ¶ 45.  Ultimately,

IPM recovered only $4,898,681.04 of its fund monies.  *See* id. ¶¶ 46–50.

IPM is also a plaintiff in the related class actions <u>Cordova, et al. v. Lehman Brothers, Inc.</u>,

---

[1]The claims were: (1) Conversion; (2) Unjust Enrichment; (3) Temporary Injunction; (4) Constructive Trust; (5) Breach of Contract; (6) Fraud; (7) Breach of Fiduciary Duty; (8) Fraud in the Inducement; (9) Civil Conspiracy; (10) Violation of Fla. Stat. § 517.12; (11) Violation of Fla. Stat. § 517.301; (12) Accounting.

05-CIV-21169-MOORE/GARBER (S.D. Fla.) and <u>Instituto de Prevision Militar v. Lehman Bros.</u> <u>Inc.</u>, 05-CIV-22827-MOORE/GARBER (S.D. Fla.). On February 10, 2006, this Court issued a Consolidation Order (dkt # 50) in this case consolidating these three related cases for the purposes of discovery. In each of these three related actions, this Court has held (dkt # 60 & 85) that the Securities Litigation Uniform Standards Act ("SLUSA") preempts all state law based claims in each complaint. The Court dismissed Plaintiff's Complaint and granted leave to file a second amended complaint pleading federal securities law claims (dkt # 60). On September 25, 2006, Plaintiff filed its Second Amended Complaint (dkt # 62) restating its state law claims, but also adding federal securities claims under Sections 12(1) and 15 of the 1933 Securities Act, and under Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5. On April 27, 2007, the Court issued an Order (dkt # 85) in which the Court granted Plaintiff another opportunity to amend its complaint. Plaintiff did not file a Third Amended Complaint within the time allowed.

Defendants bring the instant Motions to Dismiss arguing that the state law claims were properly dismissed under SLUSA, that Plaintiff does not state a claim under Sections 12(1) or 15, that Plaintiff's claims under Section 10(b) and rule 10b-5 are time-barred or, alternatively, fail because the frauds/omissions are not pled with the required particularity, the factual allegations do not give rise to a "strong inference" of scienter, and/or Plaintiff does not adequately plead loss causation and reliance.

## II.    STANDARD

A motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. <u>Milburn v. United States</u>, 734 F.2d 762, 765 (11th Cir. 1984). On a motion to dismiss, the Court must construe the complaint in the light

3

most favorable to the plaintiff and accept the factual allegations as true. SEC v. ESM Group, Inc., 835 F.2d 270, 272 (11th Cir. 1988). "[A] complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." Bowers v. Hardwick, 478 U.S. 186, 201-02 (1986) (Blackmun, J., dissenting) (quotations omitted); see Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997). Nonetheless, to withstand a motion to dismiss, a complaint must allege facts sufficient "to raise a right to relief above the speculative level[.]" Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964–65 (2007). Further, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964–65 (citations and quotes omitted).

## III. ANALYSIS

### A. Securities and Exchange Act §10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements section 10(b) by declaring it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

4

circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person, in connection with the purchase or

sale of any security.

17 CFR § 240.10b-5; Tellabs, Inc. v. Makor Issues & Right, Ltd., 127 S. Ct. 2499, 2507 (2007).

Section 10(b) affords a right of action to purchasers or sellers of securities injured by its

violation.  Tellabs, 127 S. Ct. at 2507 (citations omitted).

To state a claim "under § 10(b) and Rule 10b-5, a plaintiff must show the following: '(1)

a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff

relied, (5) that proximately caused his injury.'" Ziemba v. Cascade Intern, Inc., 256 F.3d 1194,

1202 (11th Cir. 2001) (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir.

1999)).  A section 10(b) private right of action exists only for primary conduct violating

securities laws; the private right of action does not extend to secondary actors who are alleged

merely to have aided or abetted a manipulative or deceptive act.  Central Bank v. First Interstate

Bank, 511 U.S. 164, 191 (1994) (eliminating aiding and abetting liability in private causes of

action).

### 1.    Fraud, Misrepresentations and Omissions

To survive a motion to dismiss, a plaintiff's claims of fraud under § 10(b) and Rule 10b-5

must satisfy the requirements of Fed. R. Civ. P. 9(b), which requires that "the circumstances

constituting fraud or mistake shall be stated with particularity." Ziemba, 256 F.3d at 1202.  "The

particularity rule serves an important purpose in fraud actions by alerting defendants to the

'precise misconduct with which they are charged' and protecting defendants 'against spurious

5

charges of immoral and fraudulent behavior.'" <u>Ziemba</u>, 256 F.3d at 1202 (citing <u>Durham v. Bus.</u>

<u>Management Assocs.</u>, 847 F.2d 1505, 1511 (11th Cir. 1988)).  "The application of Rule 9(b) . . .

'must not abrogate the concept of notice pleading.'" <u>Id.</u>  Further, "Rule 9(b) must be read in

conjunction with Rule 8(a) [of the Federal Rules of Civil Procedure], which requires a plaintiff to

plead only a short, plain statement of the grounds upon which he is entitled to relief." <u>Brooks v.</u>

<u>Blue Cross and Blue Shield of Florida, Inc.</u>, 116 F.3d 1364, 1371 (11th Cir. 1997) (citing <u>O'Brien</u>

<u>v. National Property Analysts Partners</u>, 719 F. Supp. 222, 225 (S.D.N.Y. 1989)).

  "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were

made in what documents or oral representations or what omissions were made, and (2) the time

and place of each such statement and the person responsible for making (or, in the case of

omissions, not making) same, and (3) the content of such statements and the manner in which

they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'"

<u>Ziemba</u>, 256 F.3d at 1202 (citing <u>Brooks</u>, 116 F.3d at 1371).  A list containing allegations of

fraud describing the nature and subject of statements has been found to be sufficient, even where

precise words used were not alleged.  <u>Brooks</u>, 116 F.3d at 1371 (citing <u>Seville Indus. Machinery</u>

<u>Corp. v. Southmost Machinery Corp.</u>, 742 F.2d 786, 791 (3rd Cir. 1984)).

  Plaintiff alleges that Defendants helped PFA carry out its fraudulent scheme by assisting

PFA in marketing PFA's pension funds, and by allowing PFA to use Merrill Lynch's name,

marketing literature, company seal, good reputation, and to hold Merrill Lynch out as the

custodian and safeguard of investors' funds.  2nd Amend. Compl. ¶¶ 17–21, 37, 41, 48, 132; Pl.

Resp. at 12.  However, allegations of "substantial assistance in [an] alleged fraud" or playing a

"significant role in drafting, creating, reviewing, or editing allegedly fraudulent [marketing

6

materials]" are "the kinds of [aiding and abetting] allegations that were rejected in <u>Central Bank</u>." <u>Ziemba</u>, 256 F.3d at 1205. Prior to the Supreme Court eliminating private causes of action for aiding and abetting securities fraud in <u>Central Bank</u>, the Eleventh Circuit required plaintiffs bringing private causes of action for aiding and abetting securities fraud to show that the defendant (1) had "general awareness that his role was part of an overall activity that [was] improper," and (2) "knowingly and substantially assisted the violation." <u>Rudolph v. Arthur Andersen & Co.</u>, 800 F.2d 1040 (11th Cir. 1986). Therefore, to show primary liability under section 10(b), a plaintiff must be able to show a defendant had more than "general awareness that his role was part of an overall activity that [was] improper" and did more than "substantially assist" a violation.

Most of Plaintiff's allegations are nothing more than allegations that Defendants aided and abetted PFA in its fraudulent activities. For example, Plaintiff alleges that "Merrill Lynch knew it *would be held out* to investors as the custodian of investor funds and the vehicle for insuring the proper handling of investor funds," but falls short of alleging that Merrill Lynch misrepresented that it would be the custodian of investor funds. 2nd Amend. Compl. ¶ 17, 19–21 (emphasis added). If PFA held Merrill Lynch out as something other than what it was, then any fraud was on the part of PFA, not necessarily Merrill Lynch. Plaintiff alleges that "[w]ith Merrill Lynch's *assistance*, [PFA] successfully marketed its retirement trust plans to IPM," that "with Merrill Lynch's *assistance*, [PFA] was presented as being a business partner of Merrill Lynch," and that "Merrill Lynch knowingly provided *substantial assistance* to [PFA]'s fraudulent scheme." 2nd Amend. Compl. ¶ 19, 20, 41 (emphasis added). However, Defendants are not liable to Plaintiff, a private party, for giving "substantial assistance" to PFA's fraud. *See* <u>Ziemba</u>,

7

256 F.3d at 1205.  For similar reasons Plaintiff's allegations that Merrill Lynch "*agreed* to serve as co-sponsor," "*agreed* to serve as custodian and trustee," and "*allowed* its corporate name, corporate logos and . . . its corporate reputation *to be utilized* in [PFA's materials]," also fail to state a claim for primary liability.  2nd Amend Compl. ¶ 17, 20 (emphasis added).  Plaintiff alleges that it was mislead by PFA's use of Merrill Lynch's name, because Merrill Lynch's name and reputation made Plaintiff assume that the pension funds would be more secure.  However, that Plaintiff hoped the investment would be secure or thought Merrill Lynch had a good reputation is not enough to create primary liability.

Further, most of Plaintiff's allegations do not satisfy the particularity requirements of Rule 9(b), because Plaintiff does not point to particular statements or wording in specific documents.  Rather than naming particular documents or marketing materials containing misleading information, Plaintiff, for the most part, refers generally to "trust agreements and related solicitation and promotional materials" or "trust agreements, certificates, and other documents."  *See e.g.* 2nd Amend. Compl. ¶ 20.

Also, Plaintiff does not allege "what Defendants obtained as a consequence of the fraud." *See* Ziemba, 256 F.3d at 1202.  Plaintiff does not allege that Defendants made any withdrawals from the accounts for personal purposes or otherwise misappropriated Plaintiff's money. Plaintiff does not allege that Defendants allowed any withdrawals other than those made by PFA, whose name was listed on the account.  Rather, the major fraud described is the misuse, by PFA, of Plaintiff's money, the large unauthorized withdrawals that PFA made for improper purposes. However, Plaintiff does not allege that Merrill Lynch profited as a result of the mishandling or misappropriation of Plaintiff's money done by PFA or its directors.  Plaintiff does not allege that

8

Merrill Lynch has in its possession or used any of the money missing from Plaintiff's account; rather, the Plaintiff's missing money is alleged to have been misappropriated by PFA for "[PFA's] own benefit and for [PFA's] principals' personal use." 2nd Amend. Compl. ¶34. Assuming Plaintiff intended the Second Amended Complaint to imply, even though Plaintiff does not state it, that Defendants profited because PFA solicited business and deposited the money into Merrill Lynch accounts, this appears to be the same general business profit they would receive from any sales representative legitimately opening a new account, not necessarily because of the fraud. Arguably Merrill Lynch would have profited more if PFA had not made large withdrawals from the account.

Plaintiff argues that by allowing PFA to use Merrill Lynch's name to perpetrate a fraud, Defendants mislead investors into believing that investing in PFA's pension funds would be a secure investment. Plaintiff cites Rudolph v. Arthur Andersen & Co., which states "[s]tanding idly by while knowing one's good name is being used to perpetrate a fraud is inherently misleading." 800 F.2d 1040 (11th Cir. 1986). However, Rudolph predates Central Bank and did not distinguish precisely between primary liability and aiding and abetting liability. Shapiro v. Cantor, 123 F.3d 717, 721 n.2 (2nd Cir. 1997). More importantly, Rudolph is distinguishable because it deals with liability of accountants, not business partners. In Rudolph, the Eleventh Circuit emphasized that accountants have a duty to independently evaluate a company and when they offer an opinion or certify financial statements, they undertake "a special relationship of trust vis-a-vis the public" and hold themselves out as "an independent professional source of assurance." Rudolph, 800 F.2d at 1044. Companies and people in business with each other to jointly market a product, on the other hand, do not have this "special relationship of trust" to the

9

public. Companies in a joint venture do not independently evaluate and certify to the public the quality of the business practices and financial statements of each business partner; neither do they hold themselves out to the public as being independent or disinterested.

Plaintiff alleges that Defendants authored a letter of recommendation attesting to the integrity of PFA's business practice, that Defendants knew would be distributed to Plaintiff to guarantee the safety of the pension funds and give a false sense of security. 2nd Amend. Compl. ¶¶ 35–36. However, "to be primarily liable under §10(b) and Rule 10b-5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant *at the time that the plaintiff's investment decision was made*." Ziemba, 256 F.3d at 1205 (emphasis added). Plaintiff wired its investment to Merrill Lynch "on or about October 23, 2001." 2nd Amend. Compl. ¶ 22. The letter of recommendation was written "on or about December 4, 2001." 2nd Amend. Compl. ¶ 35. Because the letter of recommendation was written over a month after Plaintiff made its investment decision, Plaintiff could not have relied upon any statement in the letter of recommendation "at the time that the plaintiff's investment decision was made." Therefore, Plaintiff cannot state a section 10(b) claim based on misrepresentations in the letter of recommendation.

Plaintiff alleges that Plaintiff met with Defendants and PFA on January 22, 2002, and Defendants ratified their relationship with PFA and misrepresented to Plaintiff that they would not authorize any transactions on Plaintiff's account without Plaintiff's written consent. 2nd Amend. Compl. ¶ 37. Again, Defendant's investment decision was made on or before October 23, 2001; therefore, any misrepresentations made at the January 22, 2002 meeting occurred after the investment decision and cannot be used by Plaintiff as a basis for section 10(b) liability.

Many of the omissions, alleged by Plaintiff, also occurred after the investment decision and therefore cannot be a basis for primary liability under §10(b) and Rule 10b-5. *See* Ziemba, 256 F.3d at 1205. Plaintiff alleges that Defendants failed to inform IPM that its account "was not setup or managed as a pension fund account." 2nd Amend. Compl. ¶ 27. Plaintiff alleges that Defendants failed to inform Plaintiff about substantial and unauthorized account transactions. 2nd Amend. Compl. ¶¶ 37–39, 49. Plaintiff also alleges that Defendants failed to inform Plaintiff about their failure to fulfill the role of custodian and trustee of its funds. 2nd Amend. Compl. ¶ 49. Each of these allegations involves omissions which allegedly occurred after the investment decision was made; therefore, these omissions cannot support primary liability for Defendants under §10(b) and Rule 10b-5.

Otherwise, Plaintiff alleges that Defendants "failed to inform IPM that the securities it jointly marketed with Pension Fund of America were unregistered," and failed to disclose "that the securities at issue were required to be registered." 2nd Amend. Compl. ¶ 132. Plaintiff alleges that Defendants failed to inform Plaintiff that "[PFA] was required to register as a broker-dealer and investment advisor, and that [PFA] had failed to do so." 2nd Amend. Compl. ¶ 133. Plaintiff also alleges that Defendants omitted information about an artificial increase in PFA's net worth of about 1000% over a short amount of time. 2nd Amend. Compl. ¶ 34.

However, "a defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." Ziemba, 256 F.3d at 1206 (citing Rudolph, 800 F.2d at 1043). The Eleventh Circuit has recognized that a duty to disclose arises under two circumstances, (1) "[w]here a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive," and (2) "where the law imposes special obligations, as for accountants, brokers, or

other experts, depending on the circumstances of the case." Id. Factors to be considered in determining whether a duty to disclose exists include: "the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decision, . . . defendant's role in initiating the purchase or sale[,] . . . the extent of the defendant's knowledge and the significance of the misstatement, fraud or omission, [and] . . . [t]he extent of the defendant's participation in the fraud." Id.

Plaintiff argues that "having spoken by *permitting* its name to be used in joint solicitation materials to investors and by authoring letters to investors designed to vouch for PFA's business, Merrill Lynch had a duty to correct misrepresentations contained in those solicitation materials." Pl. Resp. at 13–14 (emphasis added). However, in the Second Amended Complaint, Plaintiff only identifies one letter of recommendation authored by Defendants to vouch for PFA's business; and, as discussed above, Plaintiff's investment decision occurred prior to receiving the letter, so Defendants cannot be held liable for omitting to correct information in that letter. Otherwise, it appears Plaintiff is arguing that as long as one company's name is listed on another company's solicitation materials, then the first company has vouched for all of the other company's business practices and is thereby responsible for any misconduct or fraud committed by that other company and its directors. Adopting such a rule would too broadly expand liability and would require the Court to find misstatements by implication, rather than to analyze the specific wording of statements actually made, as required by the particularity requirement of Rule 9(b).

12

Additionally, having a good business reputation does not automatically create a duty or obligation for a company to always act according to its reputation; rather, actions in business whether good or bad are what create a reputation. It would be quite a stretch to say that a person commits fraud whenever he acts contrary to his reputation, merely because someone expected him to act another way. Further, allegations that Merrill Lynch *permitted* PFA to use its name on advertising materials or did not request that its name be removed, really allege aiding and abetting liability, not that Merrill Lynch engaged in fraud sufficient for primary liability. Otherwise, Plaintiff does not point to any earlier statement made by Defendants that failure to disclose the allegedly omitted information would have rendered misleading or deceptive.

Alternatively, Plaintiff argues that Defendants assumed a special fiduciary duty to Plaintiff by allowing themselves to be represented as a custodian and/or trustee of the Plaintiff's funds and as being responsible for ensuring safe handling of their money. Pl. Resp. at 13–14; 2nd Amend. Compl. ¶¶ 17–21. "[F]or a confidential or fiduciary relationship to exist under Florida law, there must be substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party." Lanz v. Resolution Trust Corp., 764 F. Supp. 176, 179 (S.D. Fla. 1991). That Plaintiff believed Defendants would undertake a fiduciary role if they invested is not alone sufficient to create a duty to disclose. *See* Id. Further, Defendants must have had a duty to disclose at the time of the investment decision, and the information that should have been disclosed must have been known and relevant at the time of the investment decision. *See* Ziemba, 256 F.3d at 1205. Plaintiff does not allege that Defendants met with Plaintiff prior to their investment decision or made any attempt to advise or counsel them; rather, it was PFA who directly solicited Plaintiff's

13

investment and entered into the "Trust Agreement" with Plaintiff. 2nd Amend. Compl. ¶¶ 18–21. Plaintiff does allege that Defendants allowed the Merrill Lynch name and logo to be used in PFA's solicitation materials; however, this falls short of alleging that Defendants undertook to advise, counsel, or protect Plaintiff. Even if Plaintiff could show that Defendants assumed a fiduciary duty as a custodian or trustee of Plaintiff's funds, that duty would have begun after the investment decision, when PFA used Plaintiff's money to open the account with Merrill Lynch.

Plaintiff's argument that Defendants undertook a fiduciary duty to IPM is further weakened by the fact that Plaintiff did not have an account in its name with Merrill Lynch or any other formal relationship with Defendants; the account with Merrill Lynch was opened by PFA and was in PFA's name. Def. Mot. at 7; 2nd Amend. Compl. ¶ 25. Further, Plaintiff is inconsistent in its allegations of whether or not Defendants had knowledge of PFA's fraud and the allegedly omitted information. In several paragraphs in the Second Amended Complaint, Plaintiff alleges that Defendants did not know about PFA's fraud because they ignored "warning signs," never investigated, did not conduct the required due diligence inquiries, and neglected to scrutinize the management of Plaintiff's account. 2nd Amend. Compl. ¶¶ 27, 29, 30, 31. Additionally, the information Defendants allegedly failed to disclose was accessible to Plaintiff. For example, it would not have been difficult for Plaintiff to review available information on PFA and see that PFA had experienced an artificial increase in net worth over a short amount of time. That the securities marketed by PFA were unregistered and that PFA was not legally registered as a broker-dealer and investment advisor, is also information that Plaintiff could have discovered through an investigation of the registries prior to investing such a large some of money.

14

All factors considered, the Court holds that Plaintiff's allegations are insufficient to show

Defendants had a duty to disclose, and are insufficient to state a private cause of action under §

10(b) and Rule 10b-5 for primary liability against Defendants.

### 2.    Strong Inference of Scienter

To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the

defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or

defraud." Ernst & Ernst v. Hotchfelder, 425 U.S., 185, 193 n.12 (1976). A showing of severe

recklessness can satisfy the scienter requirement. Ziemba, 256 F.3d at 1202 (citing McDonald v.

Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989)). However, "'[s]evere

recklessness is limited to those highly unreasonable omissions or misrepresentations that involve

not merely simple or even inexcusable negligence, but an extreme departure from the standards

of ordinary care, and that present a danger of misleading buyers or sellers which is either known

to the defendant or is so obvious that the defendant must have been aware of it.'" Id.

To survive a motion to dismiss, a plaintiff must "state with particularity facts giving rise

to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. §78u-

4(b)(2) (emphasis added); Tellabs, 127 S. Ct. at 2504. To qualify as a "strong inference" within

the meaning of the statute, "an inference of scienter must be more that merely plausible or

reasonable - it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent." Tellabs, 127 S. Ct. at 2504–05. "[T]o determine whether a complaint's

scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a

comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also

competing inferences rationally drawn from the facts alleged." Tellabs, 127 S. Ct. at 2504.

15

Plaintiff urges the Court to infer that Defendants acted with an intent to deceive, manipulate, and/or defraud from the factual allegations that Merrill Lynch "jointly marketed" PFA's trust accounts, "jointly solicited" investors, authored marketing materials, placed Plaintiff's money in a fund titled in PFA's name rather than a trust account, that PFA's solicitation materials included false information, that Defendant Coloma communicated monthly with PFA's officers, that Merrill Lynch ignored "red flags" and "warning signs" including unusual account activity and large withdrawals from the account, that PFA's net worth increased substantially over a short period of time, that IPM had filed a lawsuit against PFA in 2002 alleging fraud and the looting of investor accounts, and that the securities PFA was selling were unregistered securities being sold in violation of securities law. Pl. Resp. at 14–16.

Defendants assert that the facts alleged by Plaintiff merely show that Defendants had a business relationship with PFA, not that Defendants intentionally or with severe recklessness involved themselves in PFA's fraud. The Court finds it would be reasonable to infer that PFA also mislead Defendants, and that Defendants might have had a business relationship without knowing of PFA's fraud. That Defendants jointly marketed PFA's funds, jointly solicited customers, and knew that PFA was using Merrill Lynch's name on documents sent to investors does not necessarily mean that Defendants had more than a regular business relationship with PFA. Likewise, a normal business relationship with a large account holder could reasonably lead Defendant Coloma to communicate monthly with PFA's officers.

Plaintiff's Response alleges that Defendants "authored various documents attesting to PFA's trustworthiness and business success." However, the Second Amended Complaint specifically alleges only one document, a letter of recommendation, authored by Defendants. 2nd

16

Amend. Compl. ¶¶ 35–36. This letter of recommendation was written after Plaintiff invested its funds with PFA. 2nd Amend. Compl. ¶¶ 22, 35. Because the letter was written after the investment decision, it is not as strong an indication of intent at the time of the investment decision. This allegation also reasonably leads to the alternative inference that Defendants were also deceived by PFA. Otherwise, Plaintiff does not point to any specific wording "authored" by Defendants that might show they had the requisite scienter.

Some of Plaintiff's allegations suggest that Defendants did not have knowledge of PFA's fraud. Plaintiff alleges that "Merrill Lynch never investigated whether [PFA] had proper licenses and registrations for either securities or insurance investments." 2nd Amend. Compl. ¶ 29. Plaintiff alleges that Merrill Lynch "ignored numerous warning signs," and "neglected to scrutinize the management of the account[.]" 2nd Amend. Compl. ¶ 31.

Plaintiff argues that Defendants were severely reckless in ignoring or not responding to the "red flags" and "warning signs." Severe recklessness must "approximate actual intent to aid in the fraud" and "must be shown to such an extent that a reasonable finder of fact could actually infer fraudulent intent from it." Chill v. General Elec. Co., 101 F.3d 263, 269 (2nd Cir. 1996) (citations omitted); *see also* Ziemba, 256 F.3d at 1202 (simple and inexcusable neglect are not sufficient to show scienter; rather, there must be an "extreme departure from the standards of ordinary care."). The alleged "red flags" and "warning signs" include unusual account activity, large withdrawals from the account, that PFA's net worth increased substantially over a short period of time, that IPM had filed a lawsuit against PFA in 2002 alleging fraud and the looting of investor accounts, that the securities PFA was selling were unregistered securities being sold in violation of securities law, and that PFA was not properly registered as a broker-dealer or

17

investment advisor. Pl. Resp. at 15–16.

It is undisputed that PFA was the account holder listed on Merrill Lynch's records, and it is not unusual, let alone severely reckless, for Merrill Lynch to allow an account holder to withdraw funds. Defendants are not required to carefully scrutinize an account holder's every action and question the account holder's motives. Allegations that Defendants should have known that the money in the account was pension fund money and should have been more suspicious of the account activity in a pension fund account might support a showing of negligence, but not, without more, a showing of severe recklessness. That PFA's net worth increased rapidly over a short amount of time is suspicious, but not dispositive.

Plaintiff's argument that Defendants should have been aware of and warned Plaintiff of PFA's fraud based on its alleged knowledge of the suit brought by Plaintiff against PFA in 2002 is unpersuasive. Plaintiff made its investment decision on or before October 23, 2001. 2nd Amend. Compl. ¶22. Because IPM brought this lawsuit in 2002, after their investment, knowledge of the lawsuit cannot be used to show that Defendants knew about PFA's fraud or had the requisite scienter at the time of the investment decision.

The factual allegations that PFA was selling unregistered securities in violation of securities law, and that PFA was not properly registered as a broker-dealer or investment advisor are more troubling. Defendants are sophisticated and experienced in investing in securities and would be expected to investigate securities being jointly marketed by them and make some reasonable investigation of the status of a prospective business partner brokering securities. However, there has been significant litigation and argument in this and in the related PFA fraud cases on the issue of whether and how the retirement trust funds sold by PFA were subject to

18

federal law. *See e.g.* <u>Cordova v. Lehman Bros., Inc.</u>, 413 F. Supp. 2d 1309, 1316–17 (S.D. Fla. 2006). Although the Court has held that these are "covered securities" subject to federal securities law, the extent of argument over this issue shows that the issue of how securities law, including the application of the 1933 Securities Act, applies to these retirement trusts is a non-frivolous issue. While the Court believes the status of the retirement trusts as securities required to be registered is clear, the Court cannot say that failure to discover this information would be sufficient to show more than inexcusable neglect for scienter purposes. Overall, the allegations that Defendants entered a business relationship to market funds without checking important background information, including the registration status of their business partner, are troubling and might support a showing of negligence or even inexcusable neglect. However, the Court finds that allegations in the Second Amended Complaint of Merrill Lynch's failure to adequately investigate PFA and its trust funds are not sufficient, under the circumstances, to show severe recklessness to the degree required.

The Court holds that inferences, from the factual allegations, that Defendants did not intentionally or by severe recklessness violate § 10(b) and Rule 10b-5 are at least slightly more compelling than the inferences suggested by Plaintiff.[2]

---

[2] It is notable that the Securities and Exchange Commission ("SEC") thoroughly investigated the underlying facts of the PFA fraud and appear to have concluded that Defendants did not intentionally involve themselves in PFA's fraud, <u>SEC v. Pension Fund of America</u>, Case No. 05-20863-CIV-MOORE/GARBER. The SEC did not include Defendants as parties in the litigation against PFA and its principals. <u>Id.</u> In the Complaint, the SEC asserted that PFA had "misrepresented their relationships with major financial institutions and broker-dealers, falsely holding the institutions out as trustees or custodians for investors' funds." <u>Id.</u> at Compl. ¶ 2. The SEC asserted that PFA's representations that Merrill Lynch and other financial institutions were trustees or custodians were false and that, "[n]one of the financial insitutions has ever served as a trustee or custodian for investors." <u>Id.</u> at Compl. ¶¶ 31–32. The SEC asserted that PFA forged investment certificates with counterfeit seals to perpetuate their lies about relationships with financial institutions, ant that "none of the financial institutions authorized [PFA] . . . to use their trademarks." <u>Id.</u> at Compl. ¶ 33.

### 3    Reasonable Reliance

"Reliance is an essential element of a cause of action under Rule 10b-5." <u>Ross v. Bank South, N.A.</u>, 885 F.2d 723, 728 (11th Cir. 1989). Plaintiff does not directly respond to Defendants' argument that Plaintiff has not adequately pled reasonable reliance. *See* Def. Mot. at 18–19; Def. Reply at 8–9. Further, Plaintiff alleges it "rel[ied] upon Merrill Lynch's reputation," when it entered into the Trust Agreement, rather than alleging it relied on any specific misrepresentation.

Plaintiff does raise the "fraud on the market" theory. Under the "fraud on the market" theory, "[w]hen the fraud alleged is so pervasive that absent the fraud the bonds could not have been marketed, the reliance element is established by the buyer's reliance on the integrity of the market." <u>Ross</u>, 885 F.2d at 729. However, a plaintiff must show that the securities "could not have been offered on the market at any price absent the fraudulent scheme." <u>Id.</u> (citation and quotations omitted). The Court finds that Plaintiff has not made allegations sufficient to make this showing. Further, the PFA retirement trust funds were not sold in a efficient market.

### 4.    Loss Causation

To survive a motion to dismiss, "something beyond the mere possibility of loss causation must be alleged." <u>Twombly</u>, 127 S. Ct. at 1966 (citing <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005). To establish loss causation, "a plaintiff must show 'that the untruth was in some reasonably direct, or proximate, way responsible for his loss.'" <u>Robbins v. Koger Properties, Inc.</u>, 116 F.3d 1441, 1447 (11th Cir. 1997) (citing <u>Huddleston v. Herman & MacLean</u>, 640 F.2d 534, 549 (5th Cir. Unit A 1981), aff'd in part, rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). "If the investment decision is induced by

misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted." Id. In other words, a plaintiff must show that "the misrepresentation touches upon the reasons for the investment's decline in value." Id.

Plaintiff alleges that "Merrill Lynch knowingly provided substantial assistance to [PFA]'s fraudulent scheme and/or recklessly disregarded numerous red flags, and its actions and omissions were a proximate cause of the damages incurred by IPM," and that "[a]s a direct and proximate result of the conduct alleged herein, IPM has suffered damages in connection with its investments with [PFA]." 2nd Amend. Compl. ¶¶ 41, 135. Plaintiff argues that these allegations are sufficient to allege loss causation and survive a motion to dismiss. Pl. Resp. at 17–19. Plaintiff argues that "precision is unnecessary at [the motion to dismiss] stage." Pl. Resp. at 18 (citing Whitbread (US) Holdings, Inc. v. Baron Philippe de Rothschild, S.A., 630 F. Supp. 972, 978–79 (S.D.N.Y. 1986)). However, the Supreme Court, in Bell Atlantic Corp. v. Twombly, held that, to survive a motion to dismiss, allegations are required to be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964–65. The Court finds Plaintiff's conclusory statements that its damages were proximately caused by Defendants actions and omissions are insufficient. The Court finds nothing else in the Second Amended Complaint that alleges how the alleged misrepresentations and omissions of Defendants caused the decline in the value of Plaintiff's investment. Therefore, the Court holds that Plaintiff has not adequately pled loss causation.

**B.     Other Claims**

Plaintiff has argued several times that its state law claims are not preempted under

21

SLUSA. This contention has been firmly rejected by Orders (dkt # 60 & 85) of this Court. The Court sees no reason to reconsider these issues now. Accordingly, each of Plaintiff's claims restating a state law claim shall be dismissed with prejudice.

Defendants argue that the federal claims under sections 12 and 15 are time barred and unavailable to Plaintiff under the circumstances of this case. Plaintiff does not dispute either of these contentions in its Response (dkt # 73). The Court finds that Defendants have met their burden and shown that Plaintiff does not state a claim under these sections, and Plaintiff has not refuted Defendants' showing.

## IV.   CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Eduardo Coloma's Motion to Dismiss Counts I, II, IV, V, and VI (dkt # 65) is GRANTED. It is further

ORDERED AND ADJUDGED that Merrill Lynch's Motion to Dismiss (dkt # 64) is GRANTED. The Second Amended Complaint is hereby DISMISSED WITH PREJUDICE. This Clerk of Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 27th day of September, 2007.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:   All counsel of record
      Magistrate Judge Garber

22